UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Case No. 3:22-cr-00037 |
| | ) | Judge Aleta A. Trauger |
| TEVIN TRAVON KELLY | ) | |

# MEMORANDUM & ORDER

Tevin Kelly has filed a Motion to Dismiss Indictment (Doc. No. 34), to which the United States has filed a Response (Doc. No. 37). For the reasons set out herein, the motion will be denied.

## I. BACKGROUND

Kelly has been indicted on one count of violating 18 U.S.C. § 922(n), which makes it "unlawful for any person who is under indictment for a crime punishable by imprisonment for a term exceeding one year to ship or transport in interstate . . . commerce any firearm or ammunition or receive any firearm or ammunition which has been shipped or transported in interstate . . . commerce." *Id.* Specifically, Kelly is alleged to have knowingly received a firearm——a Ruger pistol—while under a qualifying state felony indictment.[1] (Doc. No. 3 at 1.) On October 14, 2022, Kelly filed a motion asking the court to dismiss the federal firearm indictment on the ground that 18 U.S.C. § 922(n) violates the Second Amendment of the Constitution, as interpreted by the Supreme Court in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022).

## II. LEGAL STANDARD

Motions to dismiss indictments are governed by Rule 12 of the Federal Rules of Criminal Procedure, which states that "[a] party may raise by pretrial motion any defense, objection, or

---

[1] According to the briefing, the state indictment was for aggravated assault and aggravated assault with a deadly weapon. (Doc. No. 37 at 2.)

request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b). The Sixth Circuit guides district courts to "dispose of all motions before trial if they are capable of determination without trial of the general issue." *United States v. Jones*, 542 F.2d 661, 665 (6th Cir. 1976). A defense raised in a motion to dismiss indictment is "capable of determination if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *Id.* at 664 (citing *United States v. Covington*, 395 U.S. 57, 60 (1969)). On a motion to dismiss indictment, "the [c]ourt must view the [i]ndictment's factual allegations as true, and must determine only whether the [i]ndictment is 'valid on its face.'" *United States v. Campbell*, No. 02-80863, 2006 WL 897436, at *2 (E.D. Mich. Apr. 6, 2006) (citing *Costello v. United States*, 350 U.S. 359, 363 (1956)).

### III. ANALYSIS

#### A. *Bruen* Framework

*Bruen* involved New York's licensing regime for carrying handguns, which "condition[ed] issuance of a license to carry on a citizen's showing of [a] special need." *Bruen*, 142 S. Ct. at 2122. The Supreme Court held that that approach was unconstitutional. More importantly for the purposes of this case, however, the Court also took the opportunity to reject the "'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny," around which the Courts of Appeals had, prior to *Bruen*, "coalesced." *Id.* at 2125. Instead, the Court adopted the following test:

> [W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50, n.10 (1961)). Accordingly, while "compelling state interests" may be constitutionally sufficient to permit the "narrowly tailored" regulation of, for example, speech, *see Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 165 (2015), such "means-end" issues are, at least for the most part, not determinative of the constitutionality of firearms restrictions, which must be considered based solely on the relevant court's understanding of "this Nation's historical tradition."

Although the Supreme Court acknowledged that it could not foresee every potential question that might arise under the *Bruen* approach, it did provide some basic tools for assessing whether a particular modern law comports with the historical tradition. Perhaps most importantly, "when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 142 S. Ct. at 2131. This approach calls on the courts to embark on two sets of inquiry by analogy. First, the court must determine how much the modern "societal problem" that the relevant legislature intended to address can be characterized as a new one or merely the continuation of an old one. Then, if the court finds that the problem is not new, the court must consider whether the modern law is sufficiently analogous to those that were in place before and around the time of the framing of the Second Amendment. *Id.*

How, exactly, should those analogies be drawn? It "may require a . . . nuanced approach." *Id.* at 2132. The modern world is different from the world of the founding, not just in the facts of everyday life but also in the basic norms and assumptions that underlie policymaking. Moreover, the available evidence of founding-era attitudes is, at best, an incomplete snapshot of the constitutional expectations of the era. The court's investigation, therefore, cannot be so simple as

3

just comparing the modern law under review with the laws of a couple of centuries ago, like a redline comparison in a word processing application. Rather, the court must engage in a more subtle "consideration of" whether the relevant "modern regulations . . . were unimaginable at the founding." *Id.*

Such an approach is necessary in order for *Bruen* to make sense, because a list of the laws that *happened to exist* in the founding era is, as a matter of basic logic, not the same thing as an exhaustive account of what laws would have been theoretically *believed to be permissible* by an individual sharing the original public understanding of the Constitution. No reasonable person would, for example, think that the legislatures of today have adopted every single hypothetical law capable of comporting with our understanding of the Constitution, such that any law that has not yet been passed simply must be unconstitutional. Accordingly, the court must, based on the available historical evidence, not just consider what earlier legislatures did, but imagine what they could have imagined.

**B. Application to 18 U.S.C. § 922(n)**

<u>1. Initial Textual Inquiry</u>

As a preliminary matter, *Bruen* requires that, before the court embarks on an analysis of history, it must first determine whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 142 S. Ct. at 2126. That plain text is as follows: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The Supreme Court has held that the first thirteen words of that twenty-seven word sentence are a mere "prefatory clause" that should be effectively discarded for any purpose other than "clarifying" the "operative clause" set forth in the latter fourteen words.

*D.C. v. Heller*, 554 U.S. 570, 579 (2008). The first step under *Bruen*, therefore, is to determine whether the law at issue "infringe[s]" on "the right of the people to keep and bear Arms."

The court finds that there is no plausible reading of the language of the Second Amendment—at least as that language has been interpreted by the Supreme Court—that would not implicate 18 U.S.C. § 922(n). Section 922(n) restricts three types of activity by an individual under a felony indictment: (1) shipping a firearm or ammunition; (2) transporting a firearm or ammunition; and (3) receiving a firearm or ammunition that was shipped or transported. Each of those activities involves exercising physical control over a firearm. Insofar as the first two of those three activities complicate matters somewhat in that one could arguably "ship" or "transport" a firearm without ever actually "bearing" it oneself, the act that Kelly was actually indicted for—receipt—is impossible to separate from the concept of "bearing" a firearm. *See United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 WL 4352482, at *3 (W.D. Tex. Sept. 19, 2022) (reaching same conclusion); *see also Ball v. United States*, 470 U.S. 856, 862 (1985) ("[P]roof of illegal receipt of a firearm *necessarily* includes proof of illegal possession of that weapon."). The government points out that a bar on receiving a new firearm is not a total ban on weapons possession, but neither was the law found to be unconstitutional in *Bruen*. Generally speaking, moreover, the infringement on a constitutional right in one way is not typically negated by the fact that the government did not violate the same right even further in another way. The court accordingly must treat 18 U.S.C. § 922(n) as presumptively unconstitutional and turn to the question of whether it comports with the historical tradition laid out in *Bruen*.

<u>2. Consistency with the Relevant Historical Tradition of Firearm Regulation</u>

Kelly argues that 18 U.S.C. § 922(n) is not consistent with the history of firearm regulation that framed the Second Amendment, but his briefing does not cite a single primary historical source

in support of that position. The closest he comes is citing a 2022 district court opinion[2] that cites a 2007 article[3] that purports to summarize a portion of the historical record. (Doc. No. 34 at 4.) The government—which bears the initial burden under *Bruen*—has briefed the issue more thoroughly, but still with nothing approaching the intensive analysis on which the Supreme Court relied in *Bruen*, and still primarily with citations to caselaw discussing history, not a comprehensive review of the history itself. As frustrating as that may be, it is difficult to fault the litigants. Admittedly, *Bruen* instructs courts to decide cases implicating the Second Amendment "based on the historical record compiled by the parties." *Bruen*, 142 S. Ct. at 2130 n.6. And in cases at the Supreme Court level, or which involve well-funded civil advocacy litigants, that compiled historical record may indeed be rich and voluminous. Legal wrangling about guns, however, does not only exist under the bright lights of those high-profile settings. In fact, those cases are the exceptions, and cases like this one are the rule. The Department of Justice filed firearms-related charges in upwards of 13,000 criminal cases during the 2021 fiscal year.[4] Every one of those cases involved government regulation of arms and therefore at least potentially implicated *Bruen*, by that case's own terms. It would probably be asking too much, though, to expect such numbers to be met with 13,000 squads of government-aligned historians squaring off against 13,000 teams supporting defendants.[5]

---

[2] *United States v. Quiroz*, No. PE:22-CR-00104-DC, 2022 WL 4352482 (W.D. Tex. Sept. 19, 2022).

[3] Robert H. Churchill, *Gun Regulation, the Police Power, and the Right to Keep Arms in Early America: The Legal Context of the Second Amendment*, 25 L. & Hist. Rev. 139, 157 (2007).

[4] Executive Office for United States Attorneys, U.S. Dept. of Justice, Annual Statistical Report Fiscal Year 2021 at 15 (Table 3C), available at https://www.justice.gov/usao/page/file/1476856/download.

[5] One court has suggested appointing a consulting expert pursuant to Fed R. Evid. 706 to assist the court with these issues. *See United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2022 WL 16649175, at *3 (S.D. Miss. Oct. 27, 2022). As helpful as that approach might be, this court doubts that it can be scaled to the level that would be required by the federal courts' massive docket of gun prosecutions.

What is left, then, is the necessity of deciding serious criminal cases—involving pressing questions of individual liberty and public safety—based on the arguments of non-historian lawyers, citing cases by non-historian judges, who relied on arguments by other non-historian lawyers, and so on in a sort of spiral of "law office history." *Bruen*, 142 S. Ct. at 2177 (Breyer, J., dissenting) (quoting Saul Cornell, Heller*, New Originalism, and Law Office History: "Meet the New Boss, Same as the Old Boss*," 56 UCLA L. Rev. 1095, 1098 (2009)). This is a difficult position to be in. On one hand, it is undeniable that federal courts typically "lack both the methodological and substantive knowledge that historians possess." *United States v. Bullock*, No. 3:18-CR-165-CWR-FKB, 2022 WL 16649175, at *1 (S.D. Miss. Oct. 27, 2022). On the other hand, though, these cases exist. There are scores of them, and scores more are undoubtedly coming. And while the Supreme Court's jurisdiction is mostly discretionary, the district courts' is not. Pending gun cases must be decided, which means, now, that they must be decided through the methodology set forth in *Bruen*, whether the courts are actually well-suited to that inquiry or not. *See id.* at *2 ("In reviewing the briefing and authorities presented in this case, and after conducting its own research, this Court discovered a serious disconnect between the legal and historical communities. Simply put, '[t]he firearms history that appears in law journals and court briefs is not the firearms history familiar to many mainstream historians.'") (quoting A Right to Bear Arms? The Contested Role of History in Contemporary Debates on the Second Amendment 187 (Jennifer Tucker et al. eds., 2019)).

The uncertainty inherent in applying *Bruen*, moreover, does not end with the question of historical investigation, because, even if one scrupulously and comprehensively reassembles the available historical evidence—as unlikely as that is in a garden-variety gun case—that exercise in historical reconstruction is just a prelude to the next step: forming a dispositive analogy between

historical regulations and the modern one under consideration. One difficulty in that inquiry is that, as the Supreme Court acknowledged in *Bruen*, the firearms available today are not the same as the firearms available at the time of the founding. *Id.* at 2132. That though, is just one of many differences, and it may not always be obvious which difference between the present and the past might have led modern legislators to enact a law that past legislators did not.

For example, one district court applying *Bruen* recently found that 18 U.S.C. § 922(g)(8), which makes it unlawful to possess a firearm while subject to a restraining order involving an intimate partner, is unconstitutional because, among other things, "consistent examples of the government removing firearms from someone accused (or even convicted) of domestic violence" are, according to that court, "glaringly absent from the historical record." *United States v. Perez-Gallan*, No. PE:22-CR-00427-DC, 2022 WL 16858516, at *6 (W.D. Tex. Nov. 10, 2022). But does that absence actually reflect historical attitudes regarding firearm regulation, or is it instead a feature of historical attitudes regarding the role of the state in policing violence between intimate partners? *See id.* at *4 (noting that "it wasn't until the mid-to late-1970s before states enacted laws enabling civil protection orders barring domestic abusers from further abusing the victim"). And if the change is in how we think of domestic violence, not in how we think of firearms *per se*, does the Second Amendment require us to nevertheless stick by those old norms because they happen to be relevant to firearm regulation? Or are legislators free to pass laws that reflect changes in attitudes other than those involving the right to bear arms? And how should the court tell those two types of change apart?[6]

---

[6] There are similar questions that one could ask in this case. Is the actual, functional role of indictment—as opposed to its nominal, formal meaning—actually the same today as it was at the time of the founding? What about the role of the criminal justice system in general? What about the concept of a "felony"? Complex systems change in complex ways, and not always in ways that can be easily identified from a simple survey of discrete examples. Attempting to reconstruct past constitutional understandings through a litigation-driven process of keyword searches seems to rely on the assumption that the past was little more

8

*Bruen* is a new case, and some of the uncertainty that its test has engendered will presumably recede over time, as the appellate courts sort the permissible gun regulations from the impermissible, based on whatever methods of analogy and glimpses of history find their way into the appellate record. Of course, legislatures could simply respond to those cases by enacting new laws restricting firearms in different ways, and those new laws would lead to new litigation, in a seemingly perpetual churn of jurisprudential instability. The Supreme Court typically considers such long-term issues of "workability" as a sign that a precedent "was 'not built to last.'" *Dobbs v. Jackson Women's Health Org.*, S. Ct. 2228, 2274 (2022) (quoting *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 965 (1992) (Rehnquist, C.J., concurring in part and dissenting in part)). In any event, until the appellate courts have the chance to at least try to clarify matters, it falls on district courts and state trial courts to try to find some principled way to apply *Bruen*'s vague framework to the literally thousands of prosecutions that it may call into question. There is no reason to think that this will be an easy task.

This court's best effort, however, suggests that the receipt provision of 18 U.S.C. § 922(n) is not a law that will fall in the wake of *Bruen*. As the government points out, many courts have concluded, based on the historical evidence presented to them, that the common law tradition of gun regulation permitted the disarming of certain classes of individuals based on questions regarding whether those individuals had been "peaceable" and/or "law-abiding." *See, e.g.*, *United States v. Carpio-Leon*, 701 F.3d 974, 981 (4th Cir. 2012) (unlawfully present aliens); *United States*

---

than a differently-dressed version of the present, ripe for easy one-to-one comparisons without regard for deep changes in political structure, unspoken institutional arrangements, or language. As far as the court can tell, that is not what actual historians, as opposed to litigants and litigators, believe. To the contrary, it appears to be widely understood that, as Justice Kagan recently pointed out, "'the past is a foreign country; they do things differently there.'" *Brown v. Davenport*, 142 S. Ct. 1510, 1534 (2022) (Kagan, J., dissenting) (quoting Jonathan R. Siegel, *Habeas, History, and Hermeneutics*, 64 Ariz. L. Rev. 505, 509 (2022)) (original quotation popularized by L.P. Hartley, The Go Between 9 (1953)).

*v. Yancey*, 621 F.3d 681, 685–86 (7th Cir. 2010) (unlawful users of drugs); *United States v. Vongxay*, 594 F.3d 1111, 1118 (9th Cir. 2010) (felons). Although those cases predated *Bruen*, they included historical analyses that, while less central to Second Amendment caselaw at the time, addressed the same general inquiry. Is the analogy between these historical regulations and 18 U.S.C. § 922(n) sufficiently close? Is the historical record sufficiently clear? The court, frankly, does not know—at least not with anything approaching certainty. At least one other court, moreover, has answered the same question in the opposite way, and this court sees no glaring flaws in that court's analysis—just different judgment calls on reasonably contestable, highly abstract questions of historical analogy.[7] *See Quiroz*, 2022 WL 4352482, at *10. On balance, though, and based on the material in the record in this particular case, the more persuasive argument appears to belong to the government.

The court notes three other factors that, although the court does not find them dispositive, do support the government's position, insofar as *Bruen* leaves room for such factors to matter. First, the Supreme Court, in *Bruen*, expressly contrasted New York's law with the laws of the "43 States" that "issue[] licenses to carry based on objective criteria." *Bruen*, 142 S. Ct. at 2122; *see also id.* at 2123–24, 2156. Justice Kavanaugh's concurrence, which was joined by the Chief

---

[7] Specifically, the District Court for the Western District of Texas concluded, as this court has, that there is a sufficient historical pedigree for excluding some specific legal classes of individuals—namely "felons or violent actors"—from the protections of the Second Amendment, but that court, unlike this one, found the analogy between those classes of individuals and the class of individuals under felony indictment insufficiently convincing. *See Quiroz*, 2022 WL 4352482, at *10. This court, though, is more persuaded by the reading of *Bruen* that focuses not on a minutely precise analogy to historical prohibitions, but rather an evaluation of the challenged law in light of the broader attitudes and assumptions demonstrated by those historical prohibitions. As the court has already explained, there is simply no logically sound argument that the Second Amendment—or any other constitutional prohibition—would forbid all laws other than those that *actually existed* at or around the time of the provision's adoption. Rather, the Second Amendment must, at most, forbid laws that *could not have existed* under the understanding of the right to bear arms that prevailed at the time. Because 18 U.S.C. § 922(n) is of a piece with the type of laws that were treated as consistent with the historical right to bear arms, this court finds no constitutionally fatal infirmity in the fact that it diverges from those laws in some specifics.

Justice, emphatically reiterated the importance of that distinction to the Court's holding. *Bruen*, 142 S. Ct. at 2161–62 (Kavanuagh, J., concurring). This court will follow the Supreme Court's lead and assume that 18 U.S.C. § 922(n) is rendered at least somewhat less constitutionally suspect because it relies on an objective criterion rather than government discretion (other than the discretion to indict the person in the first place).

Second, the court notes that the restriction in 18 U.S.C. § 922(n), by definition, "is temporary. It lasts only from indictment to conviction or acquittal." *United States v. Laurent*, 861 F. Supp. 2d 71, 102 (E.D.N.Y. 2011). Although the record includes no historical deep-dive establishing that such a distinction should necessarily have constitutional significance, it seems likely that history would support the general assumption that temporary, situational restrictions are, though not necessarily permissible, at least less constitutionally suspect than permanent, unyielding ones. Certainly, other areas of constitutional law acknowledge such a distinction, and the analysis in *Bruen* expressly appealed to analogies between the Second Amendment and other constitutional protections. *Bruen*, 142 S. Ct. at 2130 ("This Second Amendment standard accords with how we protect other constitutional rights. Take, for instance, the freedom of speech in the First Amendment . . . ."); *see City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1473 (2022) (discussing time, place, and manner restrictions under the First Amendment).

As aggressive as *Bruen* is in its rejection of means/ends review, this court does not read it as wholly forbidding courts from engaging in this narrower type of supplemental common sense reasoning—that, for example, heavy restrictions are typically more problematic than light ones, temporary restrictions are typically less problematic than permanent ones, and so forth—in order to bridge historical gaps, at least as long as the court is careful not to let that reasoning supplant or override the historical inquiry. After all, the court is aware of no historical evidence that founding-

11

era Americans believed that judges had to ignore even the most obviously consequential practical distinctions in favor of a wholly abstract game of spot-the-analogy-across-the-ages. If anything, depriving judges of the ordinary tools of reasoning that they have employed throughout the common law tradition would itself seemingly violate the text and original meaning of the Constitution, which grants federal courts "judicial Power," as it was understood at the time, not some now-freshly-discovered species of judicial power confined to a single, rigid form of resolving ambiguity. U.S. Const. art. III, § 1; *see* Saul Cornell, *President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era*, 89 Fordham L. Rev. 1761, 1773 n.93 (2021) ("[T]here was not a fixed set of legal rules employed by the founding generation to ascertain the meaning of the Constitution."); H. Jefferson Powell, *The Original Understanding of Original Intent*, 98 Harv. L. Rev. 885, 895–96 (1985) ("The late eighteenth century common lawyer conceived an instrument's 'intent'—and therefore its meaning—not as what the drafters meant by their words but rather as what judges, employing the 'artificial reason and judgment of law,' understood 'the reasonable and legal meaning' of those words to be.") (quoting *Talbot qui tam v. Commanders and Owners of Three Brigs*, 1 Dall. 95, 100 (Pa. 1784)).

  Finally, the court notes that the restrictions found in 18 U.S.C. § 922(n) are specifically tied to the administration of justice, an area in which individuals "may face substantial liberty restrictions," at least for limited periods of time, in the name of maintaining the integrity and functioning of the relevant proceedings. *United States v. Salerno*, 481 U.S. 739, 749 (1987). The Supreme Court stressed in *Bruen* that "[t]he constitutional right to bear arms . . . is not 'a second-class right,'" *Bruen*, 142 S. Ct. at 2156, but it is equally true that the right to bear arms is just one constitutional principle among many. The broader caselaw regarding criminal proceedings

12

recognizes a constitutionally meaningful government interest in safeguarding those proceedings that is sufficient to justify at least some temporary curtailments of even the most important individual rights. For example, there is a right not to be detained without due process, but, "[i]f the police suspect an individual of a crime, they may," in at least some situations, "arrest and hold him until a neutral magistrate determines whether probable cause exists." *Salerno*, 481 U.S. at 749 (citing *Gerstein v. Pugh*, 420 U.S. 103 (1975)). Similarly, there is a right to freedom of speech and the press, but "[c]ollaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures." *Sheppard v. Maxwell*, 384 U.S. 333, 363 (1966). The same special concerns are relevant to Kelly's challenge. The provision at issue here is not, after all, a prohibition on certain individuals' exercising Second Amendment rights in general. It is, rather, a much narrower prohibition on obtaining new weapons during the period of time in which a person is the subject of an active felony prosecution. Even in a world in which the right to bear arms is zealously protected, it is not difficult to imagine why the government might have a particular, narrowly acceptable interest in preventing an individual from amassing a fresh arsenal while the proceedings that might ultimately end in his imprisonment are ongoing.

    The court accordingly holds that 18 U.S.C. § 922(n) is consistent with the Second Amendment and that Kelly's indictment therefore need not be dismissed. The court's confidence in that holding, however, is low. Applying difficult law to difficult cases is the court's job, of course, and there is no room for complaining about that. The court raises the issues that it has, though, because one of the stated rationales for *Bruen*'s approach was that the Supreme Court believed that the "historical tradition" standard would be "more administrable" than alternative balancing rules that, prior to *Bruen*, were assumed to govern a wide array of constitutional issues.

13

Case 3:22-cr-00037   Document 41   Filed 11/16/22   Page 13 of 14 PageID #: 96

*Bruen*, 142 S. Ct. at 2130. The Supreme Court was, of course, speculating—the only thing it could do, since there is no way to know how a precedent will be applied until the precedent actually exists. Now, though *Bruen* is on the books, and the question of how manageable a precedent it will be can begin to be answered in the laboratories of administrability that are the U.S. district courts.

## IV. CONCLUSION

For the foregoing reasons, Kelly's Motion to Dismiss Indictment (Doc. No. 34) is hereby **DENIED**.

It is so **ORDERED**.

ALETA A. TRAUGER
United States District Judge